Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals or the Court of Service are admonished to draw an eye and give their attention to the court's announcement. God save the United States and the Republic for which it stands, one and all. Good morning, Your Honor. Good morning. And may it please the court. Probable cause to search exists where there is a fair probability that evidence of a crime or contraband will be found in the place to be searched at the time of the search. And in this case, the probable cause to search Mr. Green's car stemmed from the alert of a drug detection dog with a remarkable record of failure in the field. At the time that this dog alerted on Mr. Green's car, this dog had alerted 85 times in the several years before this traffic stop. And of those 85 times, drugs were found 22 times. That's a success rate of about 26%. Or to put it another way, about... Maybe the police officer didn't do a good job looking behind the door. Maybe, Your Honor. We don't know, do we? We don't. We don't. What case do you have that would support that this court could overturn it on that basis, the dog's field proficiency? Your Honor, there are no cases that have specifically dealt with this sort of failure rate. I've never seen a case where the failure rate was this low. I've never seen a case where the failure rate was greater than 50%. But to suggest, Your Honor, that the incompetence of the police officers doing the search is the answer to all of these alerts... To all these false alerts, I would submit, would not be a fair assessment of this evidence. We should assume that these policemen do their jobs, search thoroughly, and that if drugs are there, they would find... Do we consider the dogs a record in training? We do, Your Honor. What was the dog's record in training? According to the troopers, this dog was perfect in training. Both state troopers testified that in training, the dog always learned... What would you have us do with that? Consider it, yes, Your Honor. The Supreme Court did a little more than that, though, in Florida v. Harris. It did, Your Honor, and it... It really strongly weighted the certification process over the field performance. It did, Your Honor, and went so far as to say that certification and training alone can establish... The reliability of the drug detection dog such that you can base probable cause on the dog's alert. But here you have, in addition to the training performance, what you didn't have in Harris. You have field performance. And you have bad field performance. You have a situation where the dog evidently is perfect in training... But when you put the dog in the field, the dog gets it wrong about three-quarters of the time. And what do you do with that? And I suggest what you ought to do with it is say, well, why do we train dogs? We don't train dogs so that they can perform well in training. We train dogs so they can perform well in the field. And where their field performance is this bad, then it should undermine... Well, doesn't this dog have a slightly better record than you to indicate when you consider proof that drugs have been in cars in a time period right before the search? Yes, Your Honor, if you count that in the dog's favor. Right. But I don't think you should. I know, but if you do, then why is the dog great according to you? Then it goes up to about... You would count those ten instances in the dog's favor. The denominator would continue to be 85. The numerator would be 32, and it goes up to, I believe, 40% or so. So it does get... Why wouldn't you count those, though? Because those were instances in which the dog had alerted on an odor. And that's what the dog's being trained to detect. But with all respect, Your Honor, you're assuming that. You're assuming that there's a drug odor? Yes, Your Honor. You don't know that. There's no way for you to know that. Circumstantial evidence, certainly, isn't it, if there is evidence that there were drugs in the car or drug paraphernalia? There is. We're talking probable cause. We're not talking beyond a reasonable doubt. I agree with you. It would be a real stretch. But probable cause, and I think this is one thing Justice Kagan was really trying to make clear here, that it's not just the dog's training records. It's not just the dog's field performance. They're all the facts surrounding the search. I mean, she says pretty clearly the question, similar to every inquiry in probable cause, is whether all the facts show that the search might reveal evidence of contraband or a crime. And here we've got the multiple air fresheners in the vehicle. You've got Mr. Green. I mean, I watched the video. He was really nervous during the time period and got more nervous after the police had evidence of the protective order that had been issued. Then he started acting differently. So there were a lot of other things, weren't there, in addition to the facts? There were other things, Your Honor, that the district court could have relied upon to perhaps buttress the finding of probable cause based on the dog's alert. But the district court never found any of those as facts. We aren't bound by that, though, are we? Yes, you are. There's no dispute there were air fresheners. There's no dispute about that, Your Honor, but there's no finding of fact with respect to these other issues about extreme nervousness or evasiveness or any of these other... So we can't watch the video you're saying? With all respect, I don't believe you can, Judge. Do you think that's fact-finding? I do. Look at someone and his lip kept going up and down like that? I believe it is, yes, Judge. I believe that you are bound by the facts found by the district court. You can find them. You can reject them if you find them to be clearly erroneous, but you can't find facts yourself. What would you... You would have us look just at the dog's operation in the field? No, Judge. I believe you should consider training as well, but I submit to you that where the field performance is this poor, it should undercut, it should undermine... That's what I'm trying to get to. I'm trying to get to what is your standard. Your standard in the field, because you say it undercuts his training, then you must have some number in the field that wouldn't be so bad that it would undercut training performance, right? That would be your standard, I think. It would, Judge. I'm trying to get to what would that standard be in the field. In the field, if the dog gets it wrong more often than it gets it right, then... So you would then have preponderance of the evidence as a standard? If I were writing on a clean slate, yes, I would. That's inconsistent with probable cause. It is, Judge. What's probable cause? Fair probability, and no court that I'm aware of has ever quantified that. Indeed, most courts have said it doesn't even mean more likely than not. If I were writing on a clean slate, I'd say it had to be more than 50%. You're not on the Supreme Court, neither are we, so we're not writing on a clean slate. You want to tell me then that your standard for when you would have us assess a dog would be new law? No, Judge. Then applying the law of probable cause, what is your number? 26% is not enough, Judge. That would be the number. What is your number? I didn't ask you what is enough. Do you have a number, or do you just know it when you don't see it? The latter. The latter, to be honest with you. So it could be 48 might be, in your opinion, too low. Maybe, Judge. But with all respect, I don't have to argue that case. I'm arguing this case with 26%. You know what? With all due respect, you have to answer my questions now, don't you? And I get to ask you questions so I can test your theory, correct? Oh, I know. And by the way, I was just thinking, no offense to you, but I wonder how many people argue appeals and don't win 26% of the time. I was kind of wondering. You know, it depends on what the law is and the facts are in the case. Yes, Judge. You know what I mean? And I understand your point, but I think when you take it in light of false negatives that dogs can have, a false negative, or you can have a false positive, or when you take into account that drugs were recently in the car, and the dog, the odor doesn't dissipate automatically when drugs are taken out of the car. But, Your Honor. And the training. It seems to me you have a pretty tough burden to meet in a case like this, though. I know you think you can meet it, but it seems to me it's pretty tough. Well, Judge, let me address this whole issue that you brought up, Your Honor, about these instances where the drivers indicate that drugs may have been present in the past. And the court's inclination, at least during argument, is to say, well, count that in the dog's favor. Well, that's not faithful to the test for probable cause. The test for probable cause is not whether evidence or contraband was present at some time in the past. It's whether evidence or contraband is present at the time of the search. Yeah, but you know as well as I know, oftentimes the mastery judge will issue a probable cause warrant to go search a home, and the guns won't be there anymore. Correct, Your Honor. That doesn't mean that information could not have been used to issue the search warrant, does it? Well, plus you're relying on evidence of the past, too, aren't you? Because in saying there was only a 23% success rate, you're not talking about what Bono did at this crime scene. You're talking about what he did in the past. No, that's correct, but probable cause always looks to the past. Right, but you're suggesting to Judge Shedd, I think, that you can't look at what was done in the past. I'm suggesting to you, Your Honor, that you cannot and be faithful to the probable cause test, count in the dog's favor these instances where there might have been drugs present in the past. I don't think that's fair. You're assuming that the dog is infallible in testing whether the dog is fallible. There's no way to know whether that invisible odor was present. You think we had the situation where the dog alerts on the car and just in a training exercise, let's just say, to try to take all the other factors out of it, and the dog hits on the car, but there are no drugs in the car, but we all would agree that there were drugs in that car 30 seconds before the dog was introduced to the car. You think that should count as a negative toward the dog? No, Your Honor, not where we know that. Right. But that's not the situation here. What you have here is instances, for example, one of the alerts that you might be inclined to count in the dog's favor where no drugs were found, a driver indicated that he was a user of narcotics, a user of prescription drugs. That was counted, by this theory, you would count in the dog's favor because the driver used narcotics, used a prescription drug. Is that fair? It depends if the dog's trained to hit on those kind of drugs. Because the driver used drugs, used a prescription drug. But you don't know when. Are you suggesting that he used it 30 years ago? We don't know, Judge. That's the whole point. I don't think it's fair to count that in the dog's favor. Maybe throw them out, throw those out and not count them against the dog, but I don't think it's right and fair to count in the dog's favor. So that would go with the number from 43% to 40%? No, it would go down to about 30%, Judge. Is that your standard? What's your standard? 26% and 30% wouldn't be either. A third of the time wouldn't be enough. I don't believe it would, no, Judge. But you don't tell us what your standard is. I don't have the guidance of any case law to tell me that, Judge. So I cannot give you that. It seems to me it's a little bit odd to make an argument. Probable cause doesn't exist in this kind of situation. Isn't it a necessary, ancillary phrase, unless I think the dog does X, which is an indicia of probable, which would meet probable cause? You want to say that it doesn't meet probable cause, and if you could write it on a clean slate, it would be more than 50%. But we know that's not the standard. Well, may I say this? Sure. My phrase after the unless you just used would be, unless there's a fair probability that evidence of a crime or drugs or contraband will be found in the place to be searched at the time of the search. I'm saying 30% is, and you would say no because 30% is not enough. X would be enough. I'm just looking for some idea. I understand your theory, but where does that take us in terms of probable cause for the law? Do you understand my question? Yes, I do, Judge. Do you want to answer it? I'll say at least 45%, Judge. That's what I'll say. But I'll say confidently that 26% is not enough. And 30%, if you deduct those 10 and take them out of the calculus, that's not enough. Mr. Cargill, may I maybe help you a little bit? Your argument, I assume, you tell me if I'm wrong, I assume is that the dog, based on his field proficiency, should be disqualified, and therefore, in this case, probable cause for the search of the car has to be based on something other than the dog's alert, right? Correct, Your Honor. That's your argument. The other argument about why the dog's numbers are too low, but for probable cause, the analysis is air freshness, nervousness, answering questions, inconsistency, in your mind now, has to be the basis for the search, not the dog, correct? Correct, Your Honor. Can we get to that part then? Let's say another question about the dog's proficiency, about your argument now. Assuming that we agree with you for the sake of argument that the dog is out, why wasn't there probable cause without the dog? First, Your Honor, because the district court didn't find this fact that any of those things supported probable cause. But there was testimony that he was excessively nervous and trembling. The troopers opined that Mr. Green appeared nervous to them. Can't we rely on any testimony in the record? You can rely on testimony, Your Honor, but with all respect, you cannot find facts. I understand, but if the trooper said that he was excessively nervous based on his rapid breathing, trembling, and reluctance in answering questions, you're saying we can't consider that? You may consider it, Judge, but there's a whole body of case law. This court has recently written opinions addressing that issue. Most people are nervous dealing with the police. Most people are very nervous dealing with the police. And there's no indication in the record how he behaved when he was in a setting where he wasn't being questioned by the police. I'm out of time, Judge, but I'll look forward to my rebuttal. All right. Mr. Booth. May it please the Court. The central question in this case is whether there was probable cause to search Green's car. We submit that there was based on the totality of the circumstances in this case. First of all, we rely heavily on Bono's alert in this case, and we rely on it primarily because the Supreme Court in Harris said that a trained dog drug dog's alert is sufficient if his training records, as opposed to his field reports. Can you win this case without the dog alert? Probably not, Judge Shedd. I don't think the remaining factors standing alone would amount to probable cause. Are you making a considered judgment that you think the remaining factors don't amount to probable cause or because the court below didn't rely on it? The court below solely decided the issue on the question of the dog's alert, relying almost extensively on the fact and having made a finding of fact. Do you think we could substitute other factors for finding a probable cause? You can consider these additional factors for the following reasons. The district court did in writing its decision with respect to the reasonable suspicion inquiry detail the officer's testimony at the suppression hearing, and that testimony refers to the air fresheners, refers to the nervousness. How would you say we would use that? You can use that because if, in fact, you make a determination that the district court did not squarely find those facts as opposed to rejecting them, you will and must consider the evidence in the light most favorable to the government. But at least it's a reasonable suspicion or probable cause. The district court in writing its decision with respect to the reasonable suspicion inquiry detail your take on that is those other factors under the district court's decision would lead you to reasonable suspicion, which would allow a search, some kind of search. Well, a reasonable suspicion would not have allowed a search of the interior of the car. I'm asking, so what good does it do you? Well, it's good because in determining the probable cause equation, you look at the totality of the circumstances. And in a case, for example, in which you may have some doubt, which I don't think you should have with respect to Bono, but just assuming that you do, if you have some doubt with respect to one factor, the other factors can substitute and make up for that factor. I don't know if the question is this, though. I guess my question is, did the court, do you assert to us that the court relied on factors other than the dog alert for the basis of finding probable cause and, therefore, no suppression? No, you're right, Judge Shedd. The district court relied. I'm asking the question. The question is, the district court relied solely on the dog alert. Do you think we may look at the record and substitute some other basis of finding probable cause other than the dog? Yes. You can consider the additional facts in the record under the theory that I outlined earlier, namely, in a case in which a district court does not make necessary findings of fact, this court will review the record in the light most favorable to the government. And since those facts, which were adduced by Trooper Johnson during his testimony at the suppression hearing, and those findings were not contradicted or rendered inconsistent by any other evidence, that is the point. If the court had found no probable cause, I guess we would never get to review that, would we? Unless there was a government appeal. Yes, if it had found no probable cause. If there was a government appeal on that fact, then would we consider those other factors? Yes. We would. You would? Because, again, the question is if there is evidence in the record and you look at the record in the light most favorable to the government. I've cited in my brief that- In light of what? A conviction? In light of the fact that the district court made a finding supporting probable cause. I've cited a couple of cases- No, no, no, no, no, no. But I said what if the government- what if the court had granted the motion to suppress because it did not agree that the dog provided probable cause? You would still get that and review the rest of the record in your favor on that issue? If we took a government appeal on that question, we would be entitled to argue to the court that if the court was silent- How would you get the facts most favorable to you under that? Now, that theory, no. Then it would not be. I agree with you. If it's a ruling against the government, then it's in the light most favorable to the defendant. In the case in which the district court- Do you take it that after whoever wins below, they get the favorable fact finding and the emphasis on the facts? Is that right? That's absolutely correct, Judge Shedd. I did emphasize the point- the last couple of words you said, you said inferences. So even though in this particular case, the district court in its probable cause determination did not rely on what we consider to be undisputed facts, you can, in sustaining the district court's ruling, rely on them. Now, I've cited a couple of cases in my brief for that proposition, the Yeager case from the Supreme Court and the Smith case- But do you argue- I thought you also said that if we don't- that if we don't accept the court's view that the dog was reliable, if we reject that, you say there's still probable cause in this case? That's a very, very difficult question. I'm not sure- I'm not going to give up. I'm sure that the remaining factors- that is to say the air fresheners, the nervousness, the criminal history, and the inconsistent stories- it's a far weaker case for the government to make that in the absence of the positive alert by Bono. But in this particular case, the district court correctly- I mean, the district court effectively anticipated the Supreme Court's case in Harris by relying on the dog's training records. I mean, the district court made a specific finding. In fact, I'd like to read that. I don't normally read findings of fact from district courts, but it said- this is on page 8 of its order- that Bono and Trooper Dillon have been recertified as a team every year since 2007, and Bono has maintained a 100 percent success rate during training and recertification exercises. In the scheme of things, though, why wouldn't- what a dog does in the field where arrests are actually made than in controlled training exercises? Because as Justice Kagan indicated in Harris, she indicated that what happens- there's a great deal of false negatives and false positives out in the field. And she said the problem- But the bottom line is- I know what she said, but isn't the bottom line that nobody gets arrested in a training exercise? People get arrested, and the Fourth Amendment questions rise out in the field. Well, that is true, but as she explained, the reason for that is that what is important is that a dog detects an odor. It doesn't detect a drug. And that in the controlled environment, the police have a greater- they have both incentive and they both have the proficiency to be able to determine whether the dog is correctly alerting to an odor as opposed to the drug. I understand all that. It still seems odd to me in pondering that. Let me suggest what I wondered. It's because, as with all things scientific, you judge it in a controlled environment. Isn't that the basis for it? Nobody suggests that a drug- I'm talking about a legal pharmaceutical drug that fights cancer- is effective unless they do a controlled study of it. You have to be able to understand the parameters to test the effectiveness and efficacy of that drug. You don't have to take into account a person's diet or what may happen in the real world. That's why I suspected the- I see you don't apparently seem to maybe agree with that, but it seems to me that you can make a heck of an argument. That all sounds nice, but arrest and people's Fourth Amendment rights are effective out there in the real world, so that's what we really need to look at. But I suspect people think that scientific reliability is always tested in a controlled environment. Do you agree with that? Well, I would agree to the extent that that is the rationale that the Supreme Court gave. So you indicate that perhaps the real world is the better testing field, but Harris indicated that there is too much of a chance of false positives and false negatives. Well, that's what I'm saying, and I guess that's premised on the scientific principle that you test reliability in a controlled environment, a training environment. Correct. But as I indicate, in this particular case, there is no reason to discount Bono's alert at all, because, again, there were these additional positive and mutually reinforcing points that went to probable cause. It's not as though any of the other factors in this case tend to detract from Bono's reliability. They all tend to be plus factors that tend to show precisely why Bono was accurate in this particular case. No, that would be the case all the time. The reasonable suspicion has to exist normally, unless the police officers just come out in the first instance all the time and bring the dog out. Most of the time it's because the officer has observed something that's the basis for the reasonable suspicion that led to the probable cause finding that he had the dog sniffed. Correct? Well, that's true. My point is simply that in this particular case, again, the probable cause and the reasonable suspicion inquiries are both based on the totality of the circumstances. And what we're seeing here is that Bono's alert, which indicated that drugs were in the car, are corroborated by a series of interlocking facts, which, again, tend to support the reliability. I'm not saying that any one of those factors standing alone would establish probable cause. But my point is, though, that Bono is still poor, even with those 75% of the time. That's what I'm saying. That's no different. In those other circumstances, he had all those things, too, that probably were corroborated by what the officer observed. And he still was wrong three out of four times. So that doesn't change. But the question is, I think your answer was probably correct the first time, without the dog, there is no finding of probable cause by the district court. It's just reasonable suspicion to have the dog searched. Correct? But, I mean, this is a much... Judge Rory, I'm not going to say that those four factors standing, all those four factors in combination, are a strong case for probable cause. I'm saying that it's a substantially weaker case. Fortunately, on the record we have here, we have an alert by a dog. And, again, under Harris, a drug dog alert can be sufficient standing alone to establish probable cause. And then you have the four additional factors in this particular case which buttresses reliability. And I guess now that since he did it in this case, his field testing may have improved. There's no reasonable suspicion required to call for that dog. No, there's no reasonable... Judge Gregory had used the term reasonable suspicion in his question, and I just wanted to say that... But you've used it several times, too. But you need it, too, though, because we haven't gotten to this point. Counsel didn't talk about it. There's a delay. Your officer talked about everything but tenant windows when he talked to the gentleman. He was saying, wherever you've been. You know, really none of the police officer's business, but it's amazing how people talk about stuff they have none... Where have you been? Well, who's the driver? Where does he work? What does that have to do with tenant windows and the license plate obscured? He could have, it seemed to me, First of all, the first reason for the stop was already complete. You saw it was obscured when you got there, so if you're going to write it up, write it up right away. He didn't. Next to the tenant windows, take your little tent machine and go and write it up. What's all this stuff about drugs and whether the passenger's an R&B singer? It was a ruse, wasn't it? We know that, right? He just really wanted the delay long enough so he can get the dog in the car, wasn't it? No, Judge Gregory, I... You don't think so? No, I... He didn't even... The officer, when you watched that video, he didn't even get his tent meter out until after... For ten minutes. Pardon? For ten minutes. Yeah, ten minutes. I mean, he was clearly working the clock, you know, just like a basketball game. Yeah, you know, they're four corners all the way. Yeah. But you can work the clock properly and you work it improperly, and the trooper worked it properly in this case. How so? Let me go through this. Let me tell you why the questioning by the officer did not measurably extend the traffic stop at all. You have to realize in this particular case, the officer stopped the car at 10.07. In three minutes, he gets the driver's license and his registration that he's going to put in. Then in three minutes after that, he gets the check from the dispatcher that indicates that the green has got a domestic violence protective order against him, which raises a concern about officer safety. Now, yes, it is true that in the three-minute period that he is putting in the license and registration check, he is asking green about his travels. The Supreme Court has said that that is entirely proper. You can ask questions unrelated to the reason for the initial stop. And again, the question is whether it measurably extends the traffic stop. Asking the questions when you're putting the license and registration doesn't extend anything at all because you're going to have to wait for that to come back anyway. So that didn't extend anything. So asking the question at that time is not improper at all. So then at 10.13 and 10.14, when the officer gets the call that there is a domestic violence protective order, there is a legitimate concern about his safety, and he wants to know more information about that. And so at that point, after he talks a little bit to green about that, he decides to do the window check. So during this entire period, he has been doing a license check, he has been talking to the defendant, and then he goes out and he does the window tinting. That lasts for 10 minutes into a 14-minute stop, and there is nothing improper about that at all under this Court's case law or any other case law. Now, it is true that later on, that when he comes back after finding that there has been a window tinting violation at around 10.17 or 10.18, then he does talk to green and ask him about drugs. This is the first time that he has asked him about drugs. What was the purpose of the question about drugs then? At that particular point, Officer Johnson's suspicions had been aroused by a number of factors. First, it was the air fresheners. Second, it was the fact that green appeared to be extremely nervous. And when he said extremely nervous, he wasn't talking about just sort of like his hands were going up and down a little bit. He said that he was breathing very, very shallow, and he said he was fumbling around with his papers when he was initially going to give him his license and registration. It doesn't surprise you that we hear that in almost every case. Shoot, I do that. I've done that when they've stopped me. You know, I'm minding my own business. It's a nervous time. I've never been stopped, but I probably would be nervous. Well, the thing is, both the Supreme Court in Ward 9 and this Court have said that nervousness, but again, he didn't say that this was just casual nervousness. Let me ask you this much. Is there anything wrong with that? If there's no delay caused by the question, is there anything wrong with asking the driver or anybody about drugs? No. There's no problem with that either. Right. The question, and Judge Greger, to get back to the point, you said this was a ruse. When officer's conduct that is unrelated to the original purpose of the stop becomes a problem, it's because when under the Supreme Court's decision in Johnson, it measurably extends the stop. There was no measure. There was no great extension of the traffic stop in this case. At the very most, at the very most, at the time that Officer Johnson decided that he was going, he was not issuing him the ticket for the window tinting, and then he asked Trooper Dillon to take the dog out. That was at around like 1018 or 1019 into the stop. You have then a period of approximately two to three minutes before the drug dog alert. And under this court's case law, this court has never found a three, three-and-a-half to four-minute period to be per se unreasonable for purpose of the drug. But isn't, if there's a weakness here, let me say this, isn't the weakest point in your presentation on behalf of the officer that he did not write the ticket at the point he knew there was a tint violation and he continued on to do other things? Isn't that, if there is a weakness, isn't that the weakest point? Well, I would agree, Judge. At that particular point, I mean, because he was asked that, and he said, did you take out your citation book? And he said, no, then I had other things. Yes, at that point, I would say the emphasis shifted from a window tint and obscure license plate violation to a drug investigation. But at the same time, Judge, remember, he still had not got back all the information about the protective order. Title II? Yes, sir. What if that measurably delays you, waiting for the dispatch to do their work and get back to you? You can't wait forever. And I'm not saying it happened in this case, but just because you're waiting to get information back, do you think that that stops the clock? No, well, you can't wait forever. As it turned out in this case, when they did the criminal history check, that took four minutes. No, but what you told me was, I said, isn't that the weakest point in your case, if there is a weak point? I thought you indicated that that might be. But you said, but he still was waiting to get information back. But I'm saying that doesn't give him carte blanche to wait any amount of time. It's still measured by delay from the time he knows he's going to write that ticket. Isn't it? I would agree that the shift went, when you said weakest point, I would agree that the shift went from the traffic investigation to the drug investigation at about that time. But that was approximately, again, three-and-a-half to four minutes. Let me ask you this much, though. I want to follow on that. Three-and-a-half minutes at the end of a 15- to 20-minute stop is different than three-and-a-half minutes at the start of the stop, isn't it? Or you don't think it is? Well, this is three-and-a-half minutes after ten minutes, in which the first ten minutes are devoted exclusively. I know, but I'm giving you a hypothetical. Okay, go ahead. I'm sorry. Three-and-a-half minutes at the end of a 20-minute stop may carry more weight than three-and-a-half minutes from the initial stop. Yes, that's true. I mean, the difference between this case and Dio Giovanni's case is that in Dio Giovanni, what happened was that the officers, as soon as they did the stop my point is you just can't, every time I ask you a question, you kind of dismiss it until I stop you and ask you again. Because I said, but don't we have to look at, isn't it time for us to look at really what happened is to consider what happened from the time he knew he was going to write a ticket for tenning? Isn't that really the point we need to focus? You say shift the focus or whatever, but isn't that when we need to look at it and see what he did after that point? Right, you need to take a look to see what he did. When he came, it was only when he took out his window-tinting meter and determined that there was a violation. After that point, did he delay the stop at all? There was a delay in the sense that he asked, yes, there was a delay there. There was a delay. Right, but it was not an improper delay. Well, then that's my next question. Do you think that is a measurable delay that would be improper under the law? Doesn't that have to be your argument there? There was a delay because you may not want to use that word, but you call it shift the focus, but he knows he's violating the law on the window tint. He could write a ticket, absolutely justified to write a ticket at that point, correct? Yes, he could have, but he didn't. He did not do that. He then pursued some other activities, but isn't that your argument? The focus of your argument, maybe it's other places too, but it has to be he did shift the focus, but he didn't do it in a way that's improper under the case law. That is correct. Thank you very much. Mr. Cargill, you have some time reserved. Thank you, Your Honor. Your Honor, police initiating a traffic stop are allowed to do basically three things. Check the driver's license and registration, run a computer check of the driver's license, and either issue a citation or let the person go. And as you point out, Your Honor, this really amounted to a ruse. He did anything but investigate a traffic violation until the very end of this traffic stop. This business about protective order, it may seem like a small point, but I think it confirms what you said, Judge Gregory, about this stop being a ruse. The district court judge asked about this protective order and wanted to know why the trooper was querying the computer about the protective order and why this delayed the stop and why it was waiting for this all the way about 12 minutes into the stop. And the trooper testified, and this is in the appendix at pages 82 through 85. The trooper testified, well, he wanted to know who was the other person on the other side of the protective order. And he wasn't sure whether it was the passenger in the car with Mr. Green. And yet nowhere in this record will you find any indication that amongst all of the questions this trooper asked Mr. Green and this passenger, there was not one question of this passenger as to whether he was the person who was the subject of this protective order. But didn't the officer say he wanted to talk to the passenger to be sure that the passenger was there freely and wasn't in danger? Didn't he say that? I don't recall that, Judge. I recall questions of the passenger along the same lines of the investigation that he was conducting with respect to that. I thought I read that. Okay. I thought he said that, not to the passenger, but that he indicated that's one reason that he did that. I'm sure, if you recall, it's correct, Judge. I just don't recall off the top of my head. But your point is none of the questions to the passenger related to anything about his safety and whether he was freely in the car. None, none at all. He wanted to know where they had been, how long they had been in Atlanta. He faulted Mr. Green because Mr. Green said, my client said, they had been in Atlanta eight days, and the passenger said they had been there 14 days. He faulted him for that. That was an inconsistent statement that gave rise to reasonable suspicion. Well, it is an inconsistent statement. That's a week. It's a very weak inconsistent statement. No, no, it's a week long. It's a week difference. It's about six days, Your Honor. How many days in a week? Well, seven. But the problem, though, Mr. Cargill, is that you read Mason, haven't you? Yes, Judge. And you've read my dissent, so you know what my view is about that, but I am constrained to the law of my dear circuit. Tell me how in the world are you going to get around Mason in this case? Well, Your Honor, this case is different. Here you have, this is more like DiGiovanni, where you have a state trooper who is conducting, in truth, a drug investigation in the guise of investigating a traffic violation. I mean, truly, Your Honor, this is the obstructed license plate. This is the obstructed license plate. You can go down Interstate 95 today and see countless cars with obstructed license plates. Oh, it is painfully weak. It has a reason to stop. I mean, it appears pretextual on its face. I agree with you. But he did have the tinted windows, and that is a violation. It is, Judge. One that he didn't even investigate until about 11 minutes into the stop. 11 minutes. And as Judge Gregory pointed out, that takes about 30 seconds. The rest of the time, he was asking him questions about... You're suggesting the law is... You don't think... I'm just saying, you suggest that an officer, when he stops somebody legally, can't... has probable cause to stop them. He can't ask for their license and insurance and run a registration and run a check on that. Sure, he can do that, yes. Absolutely, Judge. Absolutely. That takes some time to do. It does. It does, but he's supposed to do it diligently. That's the problem. You know, in Mason, what happened? In Mason, the police officer told the DMV, I'm giving you information for the check, but hold it. And we said that was okay. Hold it. That's the facts of that case. Hold it. That's what I'm saying. How did he get around that when they said, Oh, I want a check, but hold it. Don't get back to me. Wait on it. Well, I'm... Waiting for the dog, a man named Kitchen, Officer Kitchen, to come bring the dog because he was doing something else. The facts of that case, how in the world do you get around it when he... I get around it, Judge, by asking you to base it on D. Giovanni. This is like D. Giovanni. This is a drug investigation in the guise of a traffic stop for a window tent and an obstructed license plate. I agree with that. It was drug interdiction for the most part. It was a tent and tenant windows. You have at least the so-called secure license plate. That was only the tenant windows, and they didn't get to it for a long time. They asked what the passenger had for breakfast and all that kind of thing. It's just, oh, well, you said eggs, and you said bacon. Oh, it's a big difference. One is a chicken, and one is a pig. Right. I mean, so that's inconsistency. I don't know. I think that people who sleep with people every night, they can never remember what they had for supper the same dinner. But on a highway, that's a death knell. You've got to get to that dog now. I mean, but how do you... I just don't know how you get around Mason and your case. I know you say it's like that, but everything you bring up is worse in Mason. Well, everything I bring up, I believe, is on par with, if not worse... We can't reverse a panel. ...than in DiGiovanni. This panel can't reverse a published case from another panel. Your Honor, I would ask you, though, to look at DiGiovanni. Look at those facts. Compare them to what happened here. Combine it with the fact that you have this faulty alert on the part of the drug detection dog and to simply come to the conclusion that this did not rise to the level of probable cause. This was a drug investigation in the guise of a traffic violation investigation. That's what it was. This wouldn't happen to me out there. It wouldn't. Did you raise a... You brought that up. And I don't know what me is, but it wouldn't happen because you're a lawyer or whatever. What I'm asking is, did you raise any question whether or not that this was based on something that was inappropriate, like race? Did you bring that up in the district court? Your Honor, this issue we're speaking about now, the length of the detention, that issue was fully briefed and argued by a predecessor counsel. When I say you, I mean the record. The record indicated it was ever brought before the district court judge. Did not raise it as an argument. That's not a record. That's not an issue here either. The counsel did mention that this may have been a pretextual stop, but he did not pursue it as a basis for... Oh, yeah. We were talking about the pretextual aspect of it because the license plate thing is really incredible. But, I mean, they must stop a lot of cars coming out of Florida and those places like that because they allow tenant windows. And all the people who buy cars from car lots that include on their advertising the identity of the dealer on the license plate bracket. I mean, you could go down 95 today and see every other car with an obscured license plate. Happens all the time. Well, that's the problem. Air fresheners are the same way. They cost about 50 cents, and they sell millions of those things. How many Americans have air fresheners in their... But yet, this circuit says that that is an indicia that you can consider in terms of whether or not it's a drug. But there are cases that say the contrary, Your Honor. Right. And I've cited them in the brief, and I would ask the court to accept what my colleague says about this issue of probable cause. If you take out the drug dog, then all you're left with is precious little, and I don't submit that it rises to the level of probable cause. All right. Is that your 30-second wrap-up? It is, Judge. I think this clock is a little messed up. I did want to give you some numbers. No, no, no. Wait one second. Didn't nobody ask you if the clock was messed up? I don't know. It's showing you how much time you've run over, I bet you. I have run out of time, but I appreciate your attention to this. I was asking for the 30-second wrap-up. The reason I say that is because we had exactly the same issue yesterday. That clock confuses lawyers, I think. Thank you, Judge. Thank you. All right. We'll come down to Greek Council and then proceed to our next case.
judges: Roger L. Gregory, Dennis W. Shedd, Barbara Milano Keenan